In re MEMORIAL HERMANN
HEALTHCARE SYSTEM and Memorial Hermann Hospital System, Relators.

No. 14–08–00204–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Oct. 9, 2008.

Rehearing Overruled Dec. 2, 2008.

David J. Beck, David M. Gunn, Constance H. Pfeiffer, William R. Pakalka and William P. Maines, Houston, TX, for Relators.

Rusty Hardin, James G. Munisteri and Amy Catherine Dinn, Houston, TX, for Real Parties In Interest.

Panel consists of Chief Justice HEDGES, Justice FROST, and Senior Justice HUDSON.*

## MAJORITY OPINION

ADELE HEDGES, Chief Justice.

Relators Memorial Hermann Healthcare System and Memorial Her-

---

* Senior Justice Hudson sitting by assignment.

mann Hospital System (collectively, "Memorial Hermann") received a civil investigative demand ("CID") from the Texas attorney general following the demise of a rival hospital that was owned and operated by real party in interest Stealth, L.P. Suing Memorial Hermann under the Texas antitrust statute, Stealth has requested that Memorial Hermann produce copies of all materials previously disclosed to the attorney general in response to the CID. Memorial Hermann contends that those materials are privileged from discovery in private antitrust litigation and that Stealth's requests were overly broad. Because the respondent [1] ordered production, Memorial Hermann asks that we issue a writ of mandamus to vacate the trial court's discovery order. We hold that any privilege created by section 15.10(i) of the Texas Free Enterprise and Antitrust Act does not extend to CID materials held by the defendant in private antitrust litigation. We further hold that the requests are not facially overbroad. Therefore, we deny the petition for writ of mandamus.

## BACKGROUND

Memorial Hermann is a non-profit corporation that owns and operates a chain of hospitals in and around the Houston area. In 2006, Memorial Hermann was sued by Stealth, L.P., for alleged antitrust violations under the Texas Free Enterprise and Antitrust Act (the "Act"). Stealth had been formed in 2002 by a collection of physicians who sought to open and operate a for-profit hospital near one of Memorial Hermann's facilities. Stealth opened Town & Country Hospital in November 2005, but the hospital floundered immediately and was closed only a few months

later. In the underlying antitrust suit, Stealth has blamed Memorial Hermann for the failure of Town & Country Hospital. Specifically, Stealth has accused Memorial Hermann of violating the Act by arranging a "horizontal boycott" that precluded health insurance companies from contracting with the fledgling hospital.

The Act, which provides for public and private lawsuits [2] for alleged antitrust action, also empowers the Texas attorney general to investigate possible antitrust violations through the issuance of a CID. *See* Tex. Bus. & Comm.Code Ann. § 15.10(b) (Vernon 2002). After Stealth filed suit, the attorney general opened an antitrust investigation and issued a CID to Memorial Hermann. Memorial Hermann produced roughly 87,000 pages of responsive documents to the attorney general.

In its private action, Stealth propounded requests for production to Memorial Hermann, seeking copies of the CID documents that Memorial Hermann had disclosed to the attorney general. Memorial Hermann produced 54,000 pages of CID materials to Stealth but resisted further production under the claim that the remaining 33,000 pages are privileged from disclosure under section 15.10(i) of the Act. Memorial Hermann also objected that Stealth's requests were overly broad, but it produced no evidence in support of its objection. The trial court ordered Memorial Hermann to fully respond to the requests for production. This mandamus action followed.

Memorial Hermann advances two arguments in this proceeding. First, it contends that the Act contains a "blanket

---

1. The Honorable John Donovan, presiding judge of the 61st District Court of Harris County.

2. Herein we will refer to antitrust lawsuits filed by the attorney general as "public," and those filed by aggrieved persons "private." *See* Tex. Bus. & Comm.Code Ann. §§ 15.20(a), 15.21(a)(1) (Vernon 2002).

privilege" under which a defendant may decline to turn over CID materials unless its opponent can demonstrate "good cause" for such production. Second, Memorial Hermann argues that the trial court abused its discretion in overruling its objection that the requests were overly broad.

## STANDARD OF REVIEW

To obtain mandamus relief, relators must demonstrate that the trial court clearly abused its discretion and that they have no adequate remedy by appeal. *In re Sw. Bell Tel. Co.*, 226 S.W.3d 400, 403 (Tex.2007) (orig.proceeding). A trial court abuses its discretion if it reaches a decision that is arbitrary, unreasonable, or without basis or reference to guiding principles of law. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992) (orig.proceeding); *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985) (orig.proceeding). A trial court has no discretion in determining what the law is or in applying the law to the facts; therefore, a clear failure by the trial court to analyze or apply the law correctly constitutes an abuse of discretion. *Walker*, 827 S.W.2d at 840.

A party has no adequate remedy by appeal where a trial court erroneously orders the disclosure of privileged information. *In re Perry*, 60 S.W.3d 857, 862 (Tex.2001) (orig.proceeding). Likewise, there may be no adequate remedy by appeal from a trial court's order compelling production in response to an overly-broad discovery request. *In re CSX Corp.*, 124 S.W.3d 149, 153 (Tex.2003) (orig.proceeding).

## APPLICABILITY OF CID PRIVILEGE

The statute in question provides as follows:

Except as provided in this section or ordered by a court for good cause shown, no documentary material, answers to interrogatories, or transcripts of oral testimony, or copies or contents thereof, shall be available for examination or used by any person without the consent of the person who produced the material, answers, or testimony and, in the case of any product of discovery, of the person from whom the discovery was obtained.

Tex. Bus. & Comm.Code Ann. § 15.10(i)(1). Memorial Hermann asks that we interpret this section as privileging all CID materials, no matter who possesses them. In contrast, Stealth contends that this section creates a privilege that inures to the benefit of the attorney general only and may not be claimed by the person who produced CID materials to the attorney general.

### A. Plain Statutory Language

In interpreting this statute, we begin with the plain meaning, which we derive from the entire act and not from isolated portions. *See Mid–Century Ins. Co. of Tex. v. Ademaj*, 243 S.W.3d 618, 621 (Tex. 2007). We read the statute as a whole, interpreting it to give effect to every part. *See id.; City of Houston v. Fletcher*, 63 S.W.3d 920, 922 (Tex.App.-Houston [14th Dist.] 2002, no pet.). Accordingly, we consider the role of this statute in the broader statutory scheme. *See 20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex.2008). Because words in a vacuum mean nothing, we must read section (i)(1) in the context of the remainder of the statute. *See Bridgestone/Firestone, Inc. v. Glyn–Jones*, 878 S.W.2d 132, 133 (Tex.1994); *Tex. Dep't of Mental Health & Mental Retardation*, 58 S.W.3d 278, 282 (Tex.App.-Fort Worth 2001, pet. dism'd by agr.).

Section 15.10 governs the attorney general's use of a CID to probe possible

antitrust violations. *See generally* Tex. Bus. & Comm.Code Ann. § 15.10(b). Read as a whole, section 15.10(i) contemplates the manner in which the attorney general, as opposed to a private litigant, may use and disclose CID materials:

- *"The attorney general* may make available for inspection or prepare copies of [CID materials] ... in the course of any investigation or a judicial proceeding in which the state is a party." *Id.* § 15.10(i)(2) (emphasis added).

- *"The attorney general* may make available for inspection or prepare copies of [CID materials] ... for official use by any officer of the State of Texas or of the United States charged with the enforcement of the laws of the State of Texas or the United States[.]" *Id.* § 15.10(i)(3) (emphasis added).

- "Upon request, *the attorney general* shall make available [CID materials] for inspection by the person who produced such material or information[.]" *Id.* § 15.10(i)(4) (emphasis added).

- "[T]*he attorney general* shall notify the person who produced the material of the attorney general's intent to make such disclosure." *Id.* § 15.10(i)(5) (emphasis added).

- "Upon written request, *the attorney general* shall return documentary material produced under this section in connection with an antitrust investigation to the person who produced it[.]" *Id.* § 15.10(i)(6) (emphasis added).

Read in context, section (i)(1) precludes the attorney general—but nobody else—from disclosing CID materials unless either (1) the producing person consents, or (2) the person seeking to examine the materials obtains a court order permitting access. *See id.* § 15.10(i)(1). Section 15.10 does not discuss or reference private antitrust lawsuits but, rather, concerns the attorney general's use of a CID prior to the institution of a public antitrust suit. *See, e.g., id.* § 15.10(b). Therefore, the plain statutory language does not confer a privilege upon the producing person (here, Memorial Hermann) in a subsequent lawsuit.

### B. Legislative Purpose

Because section 15.10(i) is clear and unambiguous, we need not resort to rules of construction. *In re Canales,* 52 S.W.3d 698, 702 (Tex.2001) (orig.proceeding). We may still consider, among other things, the statute's objectives and the consequences of a particular construction. *Id.* We conclude that Memorial Hermann's suggested interpretation would not further the legislative objectives of section 15.10.

We need look no further than the statute itself to ascertain its statutory objectives: "The purpose of this Act is to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state." Tex. Bus. & Comm.Code Ann. § 15.04 (Vernon 2002). Consistent with this purpose, the Act empowers the attorney general to prosecute a public lawsuit against persons who are thought to have violated certain of the Act's provisions. *See id.* § 15.20(a). The Act also creates a private cause of action in favor of any person whose business or property was injured because of an antitrust violation. *See id.* § 15.21(a)(1).

The Act specifically includes several express procedural safeguards for CID recipients. For example, production is limited to those materials that would be discoverable under the Texas Rules of Civil Procedure. *See id.* § 15.10(d)(1). A recipient may petition the district court for an order modifying or setting aside the CID. *See id.* § 15.10(f). A witness who is asked to give testimony may be

accompanied, represented, and advised by counsel. *See id.* § 15.10(g)(5)(C). A testifying witness may object to any question or assert a privilege. *See id.* § 15.10(g)(5)(E). Finally, the attorney general is prohibited from disclosing materials gathered pursuant to a CID, except in certain circumstances. *See id.* § 15.10(i).

Memorial Hermann contends that the Legislature intended to create a statutory privilege in businesses' favor to encourage candid cooperation with a CID. However, because such cooperation is required by law, no additional incentive is needed. *See id.* § 15.10(g)(1). Further, the Act imposes criminal penalties on any person who deliberately evades or withholds information from a CID. *See id.* § 15.10(h)(2). Accordingly, we are not persuaded by this argument.[3] Had the Legislature intended to prohibit *all* dissemination of CID materials, even those held by a private antitrust defendant, it could have expressly crafted such a privilege. It did not.

Moreover, the consequences of Memorial Hermann's proposed construction are undesirable and obviously contrary to legislative intent. *See Bridgestone/Firestone, Inc.,* 878 S.W.2d at 134. Memorial Hermann admits that the attorney general's antitrust investigation captured 87,000 pages of responsive materials. If we were to hold that section 15.10(i)(1) creates a "blanket privilege," every document produced to the attorney general would not be available to a plaintiff who seeks to promote economic competition by enforcing the Act through a private antitrust suit. *See id.* § 15.04. The Legislature could not have intended to hamstring private plaintiffs by requiring them to demonstrate "good cause" why they should be permit-

ted to conduct discovery in support of their antitrust contentions. Therefore, we cannot accept Memorial Hermann's interpretation of section 15.10(i)(1).

### C. Harmony with Federal Judicial Interpretations

██ The Act instructs courts to construe its provisions "in harmony with federal judicial interpretations of comparable federal antitrust statutes" to the extent consistent with the Act's purpose. *See id.* The comparable federal antitrust statute provides as follows:

> Except as otherwise provided in this section, while in the possession of the custodian, no documentary material, answers to interrogatories, or transcripts of oral testimony, or copies thereof, so produced shall be available for examination, without the consent of the person who produced such material, answers, or transcripts, and, in the case of any product of discovery produced pursuant to an express demand for such material, of the person from whom the discovery was obtained, by any individual other than a duly authorized official, employee, or agent of the Department of Justice. Nothing in this section is intended to prevent disclosure to either body of the Congress or to any authorized committee or subcommittee thereof.

15 U.S.C.A. § 1313(c)(3) (1998). As Memorial Hermann notes, section 15.10 is not identical to the federal version. *See State v. Lowry,* 802 S.W.2d 669, 672 (Tex.1991). Section 15.10 omits the verbiage "while in the possession of the custodian," and includes the "good cause" standard commonly found in Texas statutes. *See id.* However, these differences are not material to our privilege inquiry. Rather, the differ-

---

**3.** *See also In re NASDAQ Market–Makers Antitrust Litig.,* 929 F.Supp. 723, 726 (S.D.N.Y. 1996) ("[C]ooperation with CID demands is required by law, and the balance of incentives is thus relatively unconvincing.").

No

ences between the state and federal statutes reflect a state legislative intent to depart from one federal standard-the federal distinction between pre-suit and post-suit disclosure. *See id.* That is, federal courts have drawn a distinction between the United States attorney general's pre-suit and post-suit disclosure of CID materials to an antitrust defendant. *See id.* Until suit is filed, all materials gathered under the federal CID remain confidential. *See, e.g., Massachusetts v. First Nat'l Supermarkets, Inc.,* 116 F.R.D. 357, 362 (D.Mass.1987). After suit is filed, however, the antitrust defendant may obtain all CID materials relevant to its defense. *See id.; Lowry,* 802 S.W.2d at 672. The Texas Legislature sought to eliminate this distinction:

> Not found in the federal statute is the "good cause" predicate to disclosure of CID materials which was added to the state statute. Rather than adopting the distinction between presuit and postsuit that was engrafted upon its federal counterpart to determine what CID materials must be made available, the Texas CID statute hinges the issue of disclosure [by the attorney general] on the existence of good cause.

*Lowry,* 802 S.W.2d at 672. Removal of this federal distinction does not extend the attorney general's privilege to the producing party.

We are reminded that section 15.04 exhorts us to construe the Act in harmony with federal judicial interpretations of *comparable*—not necessarily *identical*—federal antitrust statutes. *See* Tex. Bus. & Comm.Code Ann. § 15.04. The Fifth Court of Appeals has previously noted that section 15.10 of the Act is "very similar" to the federal version. *See Att'y Gen. of Tex.*

*v. Allstate Ins. Co.,* 687 S.W.2d 803, 806–07 (Tex.App.-Dallas 1985, writ ref'd n.r.e.). We agree; accordingly, we will construe section 15.10 in harmony with federal judicial interpretations of title 15, section 1313(c)(3) of the United States Code.

Those federal judicial interpretations consistently hold that the federal antitrust statute does not establish a privilege for CID materials held by defendants. *See NASDAQ,* 929 F.Supp. at 725 ("Indeed, the few cases that have addressed this question have come down squarely in favor of compelling the production of CID materials in the hands of Defendants."); *see also In re Air Passenger Computer Reservation Sys. Antitrust Litig.,* 116 F.R.D. 390, 393 (C.D.Cal.1986) ("Neither the statutory language nor the legislative history supports defendants' view that CID deposition transcripts are not discoverable when held by defendants in civil actions."); *In re Domestic Air Transp. Antitrust Litig.,* 142 F.R.D. 354, 356 (N.D.Ga.1992) ("The statute provides no protection against release [of CID materials] by any other party who has possession of the document.").[4]

Accordingly, we overrule relators' first issue. Because of our resolution of this issue, we need not address Memorial Hermann's contention that Stealth failed to show "good cause" for the disclosure of the CID materials.

## OVERBREADTH

In their second issue, Memorial Hermann contends that because Stealth's requests for production numbers 40 and 70 are overly broad, the trial court abused its discretion in compelling production. Stealth responds that Memorial Hermann

4. *See also Midwest Gas Svcs., Inc. v. Indiana Gas Co.,* No. IP99–0690–C–Y/G, 2000 WL 760700, at *1 (S.D.Ind. March 7, 2000) ("We agree ... that section 1313(c)(3) does not create a privilege for C.I.D. materials in the hands of a private person.").

was required to produce evidence to support its discovery objection. *See* Tex.R. Civ. P. 193.4(a). Evidence is not necessary to support an objection if the discovery requests themselves demonstrate overbreadth as a matter of law. *In re Union Pac. Res. Co.*, 22 S.W.3d 338, 341 (Tex. 1999) (orig.proceeding). Because Memorial Hermann produced no evidence to support its resistance to discovery, we are limited to the wording of the requests in determining overbreadth. *See Tjernagel v. Roberts*, 928 S.W.2d 297, 301 (Tex.App.-Amarillo 1996, orig. proceeding).

> The Requests in question are as follows:
> **Request for Production 40.** Documents reflecting any oversight of MHHS's charitable mission by the Attorney General of the State of Texas, including documents submitted to the Attorney General, documents received from the Attorney General, and documents reflecting communications with the Attorney General on this topic.
> **Request for Production 70.** To the extent not already requested and/or produced in this litigation, all documents and all answers to interrogatories produced or provided by MHHS to the Attorney General of Texas or its attorneys in connection with the Civil Investigative Demand issued to you or MHHS in 2006 (or thereafter) by the Antitrust and Civil Medicaid Fraud Division.

Notwithstanding the different subjects covered by these requests, Memorial Hermann asserts that the only remaining documents responsive to request 40 consist of the CID materials also sought by request 70. Consequently, our resolution of request 40 is dependent upon our ruling with respect to request 70.[5]

While the scope of discovery is "quite broad," it remains confined by the subject matter of the case and the reasonable expectations of gathering information that will aid in the resolution of the dispute. *See* Tex.R. Civ. P. 192.1. Therefore, discovery requests must be reasonably tailored to include only matters relevant to the case. *CSX*, 124 S.W.3d at 152. A specific discovery request that is reasonably tailored to include only relevant matters is not overbroad merely because it may call for some information of doubtful relevance. *See Texaco, Inc. v. Sanderson*, 898 S.W.2d 813, 815 (Tex.1995) (orig.proceeding). A central consideration in determining overbreadth is whether the discovery request could have been more narrowly tailored to avoid inclusion of tenuous information, while still capturing the necessary pertinent information. *CSX*, 124 S.W.3d at 153; *In re Sears, Roebuck & Co.*, 123 S.W.3d 573, 579 (Tex.App.-Houston [14th Dist.] 2003, orig. proceeding). For example, requiring production from an unreasonably long time period or from distant and unrelated locales may be facially overbroad. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex.1998) (orig.proceeding).

Memorial Hermann contends that, because the attorney general is authorized to conduct a "fishing expedition" through a civil investigative demand, any discovery request that echoes a CID therefore must be patently overbroad. We disagree with this sweeping statement. The attorney general's authority to issue a CID derives from the right to institute a public antitrust action and conduct a civil "antitrust investigation." *See* Tex. Bus. & Comm.

---

5. Memorial Hermann conceded at oral argument that it has placed its charitable mission at issue in the underlying lawsuit. *See also* Tex. Bus. & Comm.Code Ann. § 15.05(i) (permitting the court, in an antitrust suit, to consider whether a restraint to the delivery of physician services lessens the cost of such services to benefit the public interest).

Code Ann. §§ 15.10(b), 15.20. An "antitrust investigation" is "any inquiry conducted by the attorney general for the purpose of ascertaining whether any person is or has been engaged in or is actively preparing to engage in activities which may constitute an antitrust violation." *See id.* § 15.10(a)(1). A demand may require the production of documents "only if the material or information sought would be discoverable under the Texas Rules of Civil Procedure or other state law relating to discovery." *Id.* § 15.10(d)(1). The attorney general may then file a public lawsuit—using the information gathered through a CID—against any person whom the attorney general believes has violated subsections (a), (b), or (c) or Section 15.05. *See id.* § 15.20(a). Likewise, any person may also bring a private suit for the same alleged statutory violations. *See id.* § 15.21(a)(1). Given the similarities between public and private antitrust suits, and in light of section 15.10(d)(1), we are not convinced that the scope of the attorney general's investigative power *automatically* exceeds the scope of permissible discovery allowed to a private party by the Rules. *See id.* § 15.10(d)(1).

■ In support of its contention that Stealth's requests are facially overbroad, Memorial Hermann directs us to *In re Graco Children's Products, Inc.*, 210 S.W.3d 598 (Tex.2006) (orig.proceeding). In that case the plaintiff sued Graco, alleging that defects in a baby car seat's five-point harness caused the death of her son. *See id.* at 600. Shortly before the trial setting, Graco paid a substantial civil penalty to the Consumer Products Safety for failing to report defects in more than a dozen products, including high chairs, swings, strollers, toddler beds, and infant carriers. *See id.* None of the listed defects involved five-point harnesses. *See id.* The plaintiff nonetheless sought production of twenty categories of documents "including anything that mentioned or referred to" any of the defects or products. *See id.* Graco objected that the civil penalty had nothing to do with the carrier or defect at issue, and that production would involve 20,000 pages of documents located in other states. *See id.* The Supreme Court of Texas found the requests overly broad as a matter of law because there was "no apparent connection between the alleged defect and the discovery ordered." *Id.* at 601.

Unlike in *Graco,* Stealth's request is not facially overbroad. Both the attorney general and Stealth may prosecute antitrust actions against Memorial Hermann for the same statutory violations. *See* Tex. Bus. & Comm.Code Ann. §§ 15.20(a), 15.21(a)(1). Memorial Hermann has not demonstrated that all or part of the CID materials do not relate to Stealth's claims in this lawsuit. An overbreadth objection contemplates that certain responsive documents are relevant, but others are not; the request therefore should be narrowly tailored to include the former category and exclude the latter. *See generally CSX,* 124 S.W.3d at 153. In sustaining an overbroad objection, a court usually draws that line for the litigants or, at the very least, determines that such a line *can* be drawn in the first place:

> When a party's attempted reach exceeds its legal grasp, we routinely limit the reach; we do not amputate the hand. So, for example, in *American Optical* we rejected defendant's argument that "due to the overbreadth, plaintiffs' entire request for production should be struck." Instead, we concluded that "rather than ... attempting to set the precise bounds of discovery in the first instance, we believe the trial court should have an opportunity to reconsider its ruling in light of our opinion today."

*In re Alford Chevrolet–Geo,* 997 S.W.2d 173, 191–92 (Tex.1999) (orig.proceeding) (citations omitted) (Hecht, J., concurring in part and dissenting in part).

In this case, Memorial Hermann has not demonstrated that Stealth's request would capture irrelevant documents. We can envision a scenario in which a trial court could sustain an objection to requests like Stealth's if presented with, for example, either the disputed documents *in camera* or the attorney general's CID. Examination of the CID here might have permitted the trial court to conclude that the attorney general's investigation went beyond the scope of Stealth's allegations. Without such evidence, we cannot conclude that the trial court abused its discretion in overruling Memorial Hermann's objections.

We do not necessarily approve of the broad wording of requests 40 and 70. However, absent evidence that Stealth's request would capture irrelevant documents, we are constrained to find that Memorial Hermann has not shown an abuse of discretion by the trial court warranting mandamus relief.

We overrule relators' second issue.

Accordingly, we deny the petition for writ of mandamus.

FROST, J., concurring.

KEM THOMPSON FROST, Justice, concurring.

Section 15.10(i) of the Texas Free Enterprise and Antitrust Act is unambiguous. Therefore, this court need not resort to any tool of interpretation or construction to determine the meaning of the statute. The court simply should hold that it means what it says and enforce it as written. Instead, after holding that the statute is unambiguous, the court considers the desirability of the consequences of the possible interpretations. Though the court is free to pursue this course, it is best not to do so because analyzing such matters is unnecessary and potentially problematic. Accordingly, though I concur in the court's judgment, I do not join in section B of the majority opinion.

In the Code Construction Act, the Texas Legislature has observed that, even after concluding a statute is unambiguous, a court may consider various matters including the statutory objectives, legislative history, and the consequences of a particular construction. *See* TEX. GOV.CODE ANN. § 311.023 (Vernon 2005). Notably, this statute does not require consideration of such matters; it merely states that courts may consider them. Even before enactment of the Code Construction Act, courts were free to consider such matters if they chose to do so and to mention these matters in opinions. Nonetheless, with rare exceptions not applicable in the case at hand, these matters cannot be used to alter the unambiguous meaning of the statute. *See Fleming Foods of Texas, Inc. v. Rylander,* 6 S.W.3d 278, 283–84 (Tex. 1999). Therefore, references to them amount to obiter dicta.

Moreover, discussion of this court's views regarding the desirability of the consequences of a proposed construction of section 15.10(i) might suggest to some that this court would adopt a construction of the statute it believes has the most desirable consequences, even though that construction might not be reasonable in light of the statute's unambiguous text. *See ante* at pp. 199–200. Consideration of the desirability or undesirability of the consequences of a statutory interpretation cannot change this court's duty to give effect to the statute's unambiguous language. *See, e.g., Fleming Foods of Texas, Inc.,* 6 S.W.3d at 281–84 (reversing court of appeals which Texas Supreme Court stated had given the legislative history prece-

dence over the statute's unambiguous meaning). For this reason, when construing an unambiguous statute, the better course is not to address the desirability of the consequences of the possible interpretations of the statute.[1]

The legislature is elected by the people and is entrusted with enacting laws. If the legislature enacts an unambiguous law that wreaks undesirable consequences, it is the legislature's office to fix it. It is not this court's office to change or decline to enforce a clear and unambiguous law because, in the court's view, that law produces undesirable consequences. For this reason, the court should not address the desirability of the consequences of a proffered interpretation of an unambiguous statute. Even though courts may consider and discuss these and other matters regarding unambiguous statutes, the best practice is not to do so. *See, e.g., Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 621, 111 S.Ct. 2476, 2490, 115 L.Ed.2d 532 (1991) (Scalia, J., concurring in the judgment) (stating that best practice would be not to use legislative history that cannot affect the result in the case because it may confuse courts, such as the state supreme court in the case at hand, into ruling that the legislative history can change the interpretation of an unambiguous statute); *St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex.1997) (stating that courts need not resort to extrinsic aids in construing an unambiguous statute and that courts must find the legislature's intent as expressed in the language of the statute); *Jones v. Del Andersen & Assoc.*, 539 S.W.2d 348, 351 (Tex. 1976) (stating that, when a court has determined the legislative intent expressed in a statute's unambiguous language, the court's function is not to explore the wisdom of the statute but to give effect to the unambiguous language). The better course is to eschew these considerations and instead glean the meaning of the statute from its clear and unambiguous language.

---

1. Some courts have stated that, if there are two reasonable interpretations of a statute and if one would lead to an absurd result and the other would not, then the court must choose the reasonable interpretation that avoids an absurd result. *See Univ. of Tex. Southwestern Med. Center v. Loutzenhiser*, 140 S.W.3d 351, 356–57 & n. 20 (Tex.2004); *Cramer v. Sheppard*, 140 Tex. 271, 167 S.W.2d 147, 155 (1942) (stating "[w]e also are not unmindful of the rule that constitutional and statutory provisions will not be so construed or interpreted as to lead to absurd conclusions, great public inconvenience, or unjust discrimination, if any other construction or interpretation can reasonably be indulged in; but this rule only applies where the constitutional or statutory provision under consideration is open to more than one construction or interpretation"). Some courts have indicated that the "absurd results" doctrine applies even if the statute is unambiguous. *See, e.g., Tex. Dep't of Prot. & Reg. Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 177 (Tex. 2004). Even if this doctrine applies to unambiguous statutes, it is clear that it would be rare indeed for a court to conclude that the unambiguous meaning of the statute is absurd. *See Brazos River Auth. v. City of Graham*, 163 Tex. 167, 354 S.W.2d 99, 109 n. 3 (1961) (stating that "operating as we are under a strict theoretical division of governmental powers, it would take a bit of doing on the part of the judiciary to say, in the absence of ambiguous and uncertain statement or patent and manifest absurdity, that the Legislature intended something different from the clear import of the words chosen by it"). In any event, unambiguous language that produces a patently absurd result is significantly different from unambiguous language that produces undesirable consequences, and no party asserts that any interpretation of the statute in this case would produce a patently absurd result.